FILED
2013 Mar-07  PM 04:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| Joiner Superior Services, Inc. | ) | |
| | ) | **CLASS ACTION COMPLAINT** |
| | ) | |
| **Plaintiff,** | ) | **JURY TRIAL DEMANDED** |
| **v.** | ) | |
| | ) | Case No.:_____ |
| Blue Cross and Blue Shield Of Alabama; | ) | |
| Blue Cross And Blue Shield Association, | ) | |
| | ) | |
| **Defendants.** | ) | |

## CLASS ACTION COMPLAINT

Plaintiff, **Joiner Superior Services, Inc.**, on behalf of itself and all others similarly situated,  complains and alleges against Defendants, Blue Cross and Blue Shield of Alabama ("BCBS-AL") and the Blue Cross and Blue Shield Association ("BCBSA"), as follows:

## NATURE OF THE CASE

1.     This class action is brought on behalf of subscribers of BCBS-AL to redress the anti-competitive effects of an ongoing nationwide conspiracy in violation of Section 1 and Section 2 of the Sherman Act. As a member of the association, BCBS-AL and the 37 other independently operated member health plans have agreed, *inter alia*, to business, financial and/or product requirements/restrictions that unreasonably restrain competition in the market for full service commercial insurance for small groups and individuals.

2.     BCBS-AL is the largest health insurance company operating in Alabama and currently exercises market power in the commercial health insurance market throughout Alabama. BCBS-AL covers 2.3 million Alabamians. Since 2008, BCBS-AL has maintained a market share in excess of 80 percent. As of 2011, BCBS-AL maintained a market share of 86

percent in the individual policy market, and 96 percent in the small group market. A recent American Medical Association study identified Alabama has the least competitive health insurance market in the country.

3.      The dominant market share enjoyed by BCBS-AL is the direct result of  an illegal conspiracy in which thirty-seven of the nation's largest health insurance companies have agreed that they will not compete with BCBS-AL in Alabama and that BCBS-AL will have the exclusive right to do business in Alabama so long as it limits its competition with any of its thirty-seven co-conspirators in each of their assigned geographic areas. These market allocation agreements are implemented through Blue Cross and Blue Shield license agreements (which incorporate BCBSA's Rules and Guidelines) executed between BCBSA, a licensing vehicle that is owned and controlled by all of the Blue Cross and Blue Shield plans, and each individual Blue Cross and Blue Shield licensees, including BCBS-AL.  Through the terms of these per se illegal license agreements, the independent Blue Cross and Blue Shield entities throughout the country, including BCBS-AL, have explicitly agreed not to compete with one another in direct violation of Section 1 of the Sherman Act.  By so agreeing not to compete they have attempted to entrench and perpetuate the dominant market position that each Blue Cross and Blue Shield entity has historically enjoyed in its specifically defined geographic market.

4.      This illegal conspiracy to divide markets and to eliminate competition extends beyond the use of the Blue Cross and Blue Shield brand names.  Many of the Blue Cross and Blue Shield affiliates have developed substantial non-Blue brands that could compete in Alabama.  However, the illegal conspiracy includes a per se illegal agreement that the Blue Cross and Blue Shield licensees will not compete with one another through the use of their non-Blue brands, beyond a relatively *de minimis* extent.

2

5.      BCBS-AL has also unlawfully maintained its monopoly power through, *inter alia*, selective discounting practices aimed at thwarting competition and participation in the association's market allocation and suppression of competition rules.  As Birmingham Business Journal noted in its March 2009 report *"Blue-oploy: Is Blue Cross & Blue Shield's monopoly status good for the state?"* BCBS-AL gave substantial discounts to large Alabama based employers who had formed a coalition with the objective of introducing competition in the health insurance market. The discounts effectively ended the coalition.  As a result, from 2000 to 2009 the average employer-sponsored health insurance premium for families in Alabama increased by approximately 88.7 percent, whereas median earnings rose only 22.4 percent.

6.      Additionally, because BCBS-AL is a monopolist in the small group and individual full service commercial health insurance market in Alabama, its continued participation in agreements and covenants that restrain competition among independently operated member plans unlawfully maintains BCBS-AL monopoly power in violation of Section 2 of the Sherman Act.

7.      As a result of BCBS-AL's unlawfully acquired and maintained monopoly power, BCBS-AL has the pricing power to substantially increase premiums without the risk of losing enough subscribers to make the increases unprofitable.  In 2010, for example, BCBS-AL raised some premiums by as much as 21 percent.  As a result of these and other increases between 2001 and 2009, BCBS-AL correspondingly increased its surplus from $433.7 million to $649 million. In 2011, BCBS-AL reported net income of $256.92 million, 58 percent higher than the previous year. In a competitive market, such price increases would, more likely than not, prove unprofitable. Full and fair competition is the only answer to artificially inflated prices, and competition is not possible so long as BCBS-AL and BCBSA are permitted to enter into

agreements that have the actual and intended effect of restricting the ability of thirty-seven of the nation's largest health insurance companies from competing in Alabama.

## JURISDICTION AND VENUE

8.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§1331 and 1337(a) because Plaintiffs bring their claims under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against BCBSA and BCBS-AL for the injuries sustained by Plaintiffs and the Class by reason of the violations, as hereinafter alleged, of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

9.     Venue is proper in this district pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391.

## PARTIES

10.     Plaintiff Joiner Superior Services, Inc., is an Alabama corporation with its principal office located at 118 Wholesale Avenue, Huntsville, Alabama, 35811. Joiner Superior Services purchases small group full service commercial health insurance to cover its employees from BCBS-AL.

11.     Defendant BCBSA is a corporation organized under the state of Illinois and headquartered in Chicago, Illinois.  It is owned and controlled by thirty-eight (38) health insurance plans that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA was created by these plans and operates as a licensor for these plans. Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million – or one in three – Americans. A BCBS

4

licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states.

12.     The principal headquarters for BCBSA is located at 225 North Michigan Avenue, Chicago, IL 60601.

13.     BCBSA has contacts with the State of Alabama by virtue of its agreements and contacts with BCBS-AL.  In particular, BCBSA has entered into a series of license agreements with BCBS-AL that control the geographic areas in which BCBS-AL can operate. These agreements are a subject of this Complaint.

14.     Defendant BCBS-AL is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Alabama.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-AL is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Alabama.

15.     The principal headquarters for BCBS-AL is located at 450 Riverchase Parkway East, Birmingham, AL 35244. BCBS-AL does business in each county in the state of Alabama.

## TRADE AND COMMERCE

16.     BCBS-AL and the 37 other health plans that own and control BCBSA are  engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. BCBSA enters into agreements with health insurance companies throughout the country that specify the geographic areas in which those companies can compete. BCBS-AL provides  commercial  health  insurance  that covers Alabama residents when they travel across state lines, purchases health care in interstate commerce when Alabama residents require health care out of state, and receives payments from

employers outside of Alabama on behalf of Alabama residents.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action on behalf of itself and on behalf of a class of plaintiffs.

Plaintiff brings this action seeking damages on behalf of a class pursuant to the provisions of

Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class

(the "Alabama Class") defined as:

> All persons or entities who, from May 17, 2008 to the present (the "Class
> Period") have paid health insurance premiums to BCBS-AL for individual or
> small group full-service commercial health insurance.

18.     The Class is so numerous and geographically dispersed that joinder of all members

is impracticable.   While Plaintiff does not know the precise number and identity of all members

of the Class, Plaintiff believe that there are millions of Class members, the exact number and

identities of which can be obtained from BCBS-AL.

19.     There are questions of law or fact common to the Class, including but not limited

to:

> a.     Whether the restrictions set forth in the BCBSA license
>        agreements are *per se* violations of Section 1 of the Sherman Act, or are
>        otherwise prohibited under Section 1 of the Sherman Act;
>
> b.     Whether BCBSA has engaged in conduct to unlawfully maintain its
>        monopoly in the small group and individual health insurance policy
>        market by, among other things, entering into agreements and covenants
>        that restrain entry of other member health plans;
>
> c.     Whether, and the extent to which, premiums charged by BCBS-AL to
>        class members have been artificially inflated as a result of the illegal
>        restrictions in the BCBSA license agreements;
>
> d.     Whether, and the extent to which, premiums charged by BCBS-AL have
>        been artificially inflated as a result of the anticompetitive practices
>        adopted by BCBS-AL.

6

20.    The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

21.    Plaintiff is a member of the Alabama Class; its claims are typical of the claims of the members of the Class; and Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff and the Alabama Class are direct purchasers of individual or small group full-service commercial health insurance from BCBS-AL, and their interests are coincident with and not antagonistic to other members of the Class.  In addition, Plaintiff has retained and is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

22.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications, establishing incompatible standards of conduct for BCBSA and BCBS-AL.

23.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which BCBS-AL has records.  Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.   Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action does not present any difficulties of management that would preclude its

maintenance as a class action.

## FACTUAL BACKGROUND

24.     BCBS-AL enjoys unrivaled market dominance within Alabama.   As of 2008, BCBS-AL enrolled at least 93 percent of the subscribers of full-service commercial health insurance plans, whether offered through a health maintenance organization ("HMO") or through a preferred provider organization ("PPO") plan. As of 2011, BCBS-AL maintained a market share of 86 percent in the individual market, and 96 percent in the small group market.

25.     Because the BCBSA licensing agreements exclude rival health insurance plans from the market, BCBS-AL faces little pressure to constrain its own costs. With few other health insurance plan options to compete with, BCBS-AL can raise premiums (and thereby recoup its costs) without any concern that its subscribers may switch to a rival insurance plan.    The few consumers who subscribe to rival insurance plans face higher premiums as well, as these plans pass on to their subscribers the high cost of competing against BCBS-AL.

26.     Defendants' anticompetitive practices, by reducing the *choices* available to health insurance consumers and increasing the *cost* of health care in Alabama, have raised the *premiums* that Alabama residents must pay to obtain health insurance.  BCBS-AL's rival health insurance plans are excluded from the market, and the few rival plans that have broken into the Alabama market must pay significantly higher rates to health care providers.

27.     The lack of competitive options as a result of market allocation agreements, among other things, allows BCBS-AL's to abuse its monopoly power at the expense of health care plan consumers in Alabama.  In 2011 only, BCBS-AL's premiums  sustained a  17  percent increase for  some  of  its  individual subscribers.

8

28.     While originally structured as non-profit organizations, since the 1980s, local BCBS plans have increasingly operated as for-profit entities: either by formally converting to for-profit status, or by generating substantial surpluses that have been used to fund multi-million dollar salaries and bonuses for their administrators.

29.     The member organizations of BCBSA operate independent entities that have their profit maximizing objectives.

## CREATION OF THE BLUE CROSS AND BLUE SHIELD ASSOCIATION

30.     Historically, the Blue Cross plans and the Blue Shield plans were competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan. Cross-on-Cross and Shield-on- Shield competition also flourished.

31.     In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA.  At that time, BCBSA became the sole owner of the various  Blue  Cross  and Blue  Shield  trademarks  and  trade  names  that  had previously been owned by the local plans.

32.     In November 1982, after heated debate, BCBSA's member plans agreed to two propositions: that by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and that by the end of 1985, all Blue plans within a state should further consolidate, ensuring that each state would have only one Blue plan.  As a result of these goals, the number of member plans went from 110 in 1984, to 75 in 1989, to 38 today.   However, the goals did not end competition between Blue plans.

33.   From 1981 to 1986, the Blue plans lost market share at a rate of approximately one

9

percent per year.  At the same time, the amount of competition among  Blue  plans,  and  from non-Blue  subsidiaries  of  Blue  plans,  increased substantially.   As a result of this increased competition, in April of 1987, the member plans of BCBSA held an "Assembly of Plans" -- a series of meetings held for the purpose of determining how they would and would not compete against each other.   During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition.    However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Blue plans – an increasing "problem" that had caused complaints from many Blue plans.

34.    In 1986, Congress revoked the Blues' tax-exempt status, freeing them to form for-profit subsidiaries.

35.    In 1992, BCBSA ceased requiring Blue Cross and Blue Shield licensees to be not-for-profit entities. As a result, many member plans converted to for-profit status.  One such plan, now called WellPoint, has grown to become the largest  health  insurance  company  in  the country,  at  least  by  some  measures.  While nominally still characterized as not-for-profit, BCBS-AL and other non-profit Blue plans generate substantial earnings and surpluses, and pay their senior administrators and officials substantial salaries and bonuses – often in the multi-million dollar range.

36.      Throughout the 1990s, the number of non-Blue subsidiaries of Blue plans increased, and they continued to compete with Blue plans.  As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

37.    At some later date, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under *any* brand, Blue or non-Blue, as well as the

10

ability of non-members of BCBSA to control or acquire the member plans. These illegal restraints are discussed below.

## ALLEGATIONS DEMONSTRATING CONTROL OF BCBSA BY MEMBER PLANS

38.     BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade association for the Blue Cross Blue Shield companies." *See*, www.bcbs.com/about-the-association/.

39.     BCBSA is entirely controlled by its member plans, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names from BCBSA,  and  that,  but  for the "licensing" agreements and other agreements governing the association, could and would compete with one another.  On its website, BCBSA admits that in its "unique structure," "the Blue Cross and Blue Shield companies are [its] customers, [its] Member Licensees and [its] governing Board."

40.     As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans."  *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

41.     The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA.   In a pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer."   The current chairman of the Board

of Directors, Daniel J. Loepp, is also the current President and CEO of Blue Cross Blue Shield of Michigan. Terry Dee Kellogg, the current President and CEO of BCBS-AL, serves on the Board of Directors of BCBSA.  The Board of Directors of BCBSA meets at least annually, including from November 3-4, 2010 in Chicago, IL.

## LICENSE AGREEMENTS AND RESTRAINTS ON COMPETITION

42.     The independent Blue Cross and Blue Shield licensees also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"), a standing committee of the BCBSA Board of Directors that is composed of nine member Plan CEOs and three independent members.

43.     The Financial Standards Committee helps sets policies regarding minimum net worth requirements.  The net worth requirement is set forth in the minimum capital adequacy standards. By setting minimum net worth requirements that each independent, local BCBS plan must meet, the association restrains price competition.

44.     The independent Blue Cross and Blue Shield licensees control the entry of new members into BCBSA.  In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved."

45.      The independent Blue Cross and Blue Shield licensees control the rules and regulations that all members of BCBSA must obey.  According to a brief BCBSA filed during litigation in the Sixth Circuit Court of Appeals, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License

12

Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

46.     The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans."  In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised."   The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on November 18, 2010.

47.     Under the terms of the License Agreements a plan "agrees . . . to comply with the Membership Standards."    The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994;" that the Membership Standards "remain in effect until otherwise amended by the Member Plans;" that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote;" that "new or revised [G]uidelines shall not become effective . . . unless and until the Board of Directors approves them;" and that "[t]he PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure  that   .   .   .  all requirements (standards  and  guidelines)  are  appropriate, adequate and enforceable."

48.     The independent Blue Cross and Blue Shield licensees police the compliance of all members of BCBSA with the rules and regulations of BCBSA. The  Guidelines  state  that  the PPFSC "is  responsible  for  making  the  initial determination about a Plan's compliance with the license agreements and membership standards.    Based on that determination, PPFSC makes

13

a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."  In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards."  In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

49.    The independent Blue Cross and Blue Shield licensees control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations.  The Guidelines describe three responses to a member plan's failure to comply— "Immediate Termination," "Mediation and Arbitration," and "Sanctions"—each of which is administered by the PPFSC and could result in the termination of a member plan's license.

50.    The independent Blue Cross and Blue Shield licensees control the termination of existing members from BCBSA.  The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."  However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."  In a brief filed during litigation in the Sixth  Circuit Court of Appeals, BCBSA admitted that the procedure  for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each

Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

## HORIZONTAL AGREEMENTS

51.     The independent Blue Cross and Blue Shield licensees are potential competitors that use their control of BCBSA to coordinate their activities.   As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

52.     Each BCBSA licensee is an independent legal organization.   In a pleading BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that "[t]he formation of BCBSA did not change each plan's fundamental independence."   In    fact,    the    License Agreements state that [n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

53.     The independent Blue Cross and Blue Shield licensees include many of the largest health insurance companies in the United States.   The largest health insurance company in the nation by some measures is WellPoint, a BCBSA licensee.   Similarly, fifteen of the twenty-five largest health insurance companies in the country are BCBSA licensees.   On its website, BCBSA asserts that its members together provide "coverage for 100 million members" – "one- in-three Americans" and "contract with more hospitals and physicians than any other insurer."   *See*, www.bcbs.com/about-the-companies/.

54.     The competitive restrictions imposed by the licensing agreements and the rules and regulations governing BCBSA members arose and evolved in response to concerns about competition among Member plans.   Member Plans formed the precursor to BCBSA when they

15

"recognized the necessity of national coordination."  On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies." As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies."   One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

55.    Through the License Agreements, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, each independent Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area."   The License Agreement defines each licensee's Service Area as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

56.    Through the Guidelines and Membership Standards, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, and with which each licensee must agree to comply as part of the License Agreements, each independent Blue Cross and Blue Shield licensee agrees that at least 80 percent of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names.  This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business.  This provision also thereby limits the ability of each plan to

develop non-Blue brands that could and would compete with Blue plans.   It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

57.    Through the Guidelines and Membership Standards, each independent Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its   designated   Service   Area (excluding   Medicare   and   Medicaid)   shall   be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names.    The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66-2/3 percent of its national enrollment from its Blue-brand business. This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.  It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

58.    The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its Service Area.  To do so, the licensee would have to buy, rent, or build a provider network under a non-Blue brand, while ensuring that revenue derived from that brand did not exceed the one- third cap.   Should the licensee offer services and products under the non-Blue brand within its Service Area (which is likely, since that is its base of operations), that would further reduce the amount of non-Blue revenue it is permitted to earn from outside its designated area.

59.    In sum, each independent Blue Cross and Blue Shield licensee has agreed with its potential competitors that in exchange for having the exclusive right to use the Blue brand within a designated geographic area, it will derive *none* of its revenue from services offered under the

17

Blue brand outside of that area, and will derive *at most* one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand.  The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

60.     The foregoing restrictions on the ability of Blue plans to generate revenue outside of their service areas constitute agreements between competitors to divide and allocate geographic markets, and therefore are *per se* violations of Section 1 of the Sherman Act.

61.     The largest Blue licensee, WellPoint, is a publicly-traded company, and therefore is required by the SEC rules to describe the restrictions on its ability to do business.  Thus, in its Form 10-K filed February 17, 2011, WellPoint stated that it had "no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

62.     Likewise, in its Form 10-K filed March 9, 2011, Triple-S Salud, the Blue licensee for Puerto Rico, explained that "[p]ursuant to our license agreements with BCBSA, at least 80% of the revenue that we earn from health care plans and related services in [its Service Area] and at least 66.7% of the revenue that we earn from (or at least 66.7% of the enrollment for) health care plans and related services both in [and outside its Service Area], must be sold, marketed,

administered, or underwritten through use of the Blue Cross Blue Shield name and mark." Further, the Triple-S licensee stated that the territorial restrictions "may limit the extent to which we will be able to expand our health care operations, whether through acquisitions of existing managed care providers or otherwise, in areas where a holder of an exclusive right to the Blue.

63.    The member plans of BCBSA have agreed to impose harsh penalties on those that violate the territorial restrictions.  According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination."   If a member plan's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry."  In addition, in the event of termination, a plan must pay a fee to BCBSA.  According to WellPoint's February 17, 2011 Form 10-K filing, that "Re-establishment Fee," which was $98.33 per enrollee as of December 31, 2010, "would allow the BCBSA to 're-establish' a Blue Cross and/or Blue Shield presence in the vacated service area."

64.    In sum, a terminated licensee would (1) lose the brand through which it  derived the majority of its revenue; and (2) fund the establishment of a competing health insurer that would replace it as the Blue licensee in its local area. These penalties essentially threaten to put out of existence any Blue member plan that breaches the territorial restrictions.

65.    The territorial restrictions have barred all competition by all of the Blue plans (other than BCBS-AL) and all of their non-Blue branded business lines from the Alabama commercial health insurance market.

## THE ANTICOMPETITIVE ACQUISITION RESTRICTIONS IN THE BCBSA LICENSING AGREEMENTS

66.    In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which BCBS-AL and the other independent Blue Cross and Blue Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan.

67.    First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services."  Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as alleged above, the member plans control the entry of new members into BCBSA. Should a non-member attempt to join BCBSA in order to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other member plans could block its membership by majority vote.

68.    Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (i.e., to those licensees who would otherwise be capable of having their shares acquired). These include four situations in which a member plan's license will terminate *automatically*:  (1) if any institutional investor become beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any  non-institutional  investor become beneficially entitled to 5 percent or more of the voting power of the member plan; (3) if any person become beneficially entitled to 20 percent of more of the member plan's then-outstanding common stock or equity securities;  or  (4)  if  the

member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent of more of the then-outstanding common stock or equity securities. These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested member plans and also of a majority weighted vote of the disinterested member plans. These restraints effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval.

69.     These acquisition restraints reduce competition in violation of the Sherman Act because they substantially reduce the ability of non-member insurance companies to expand their business. In order to expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area. Through the acquisition restrictions, the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan.

70.     Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other member plans. During the period from 1996 to the present, there has been a wave of consolidation among the Blue plans: in 1996, there were 62 Blue licensees; at present, there are only 38.

71.     By agreeing to restrict the pool of potential purchasers of a Blue licensee to other

Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition.  The net effect is less competition and higher premium costs for consumers, including enrollees of BCBS-AL.

## THE BCBSA LICENSING AGREEMENTS HAVE
## UNREASONABLY RESTRAINED COMPETITION IN ALABAMA

72.     BCBS-AL, as a licensee, member, and part of the governing body of BCBSA, has conspired with the other member plans of BCBSA to create, approve, abide by, and enforce the rules and regulations of BCBSA, including the *per se* illegal territorial restrictions in the License Agreements and Guidelines.  Many of the member plans with which BCBS-AL has conspired would otherwise be significant competitors of BCBS-AL in Alabama.

73.     For example, WellPoint is the largest health insurer in the country by total medical enrollment, with approximately 34 million enrollees.  It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, and portions of Virginia, as well as for California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding counties, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, UniCare. But for the illegal territorial restrictions summarized above, WellPoint would be likely to offer its health insurance services and products in Alabama in competition with BCBS-AL.   Such competition would result in lower health care costs and premiums paid by BCBS-AL enrollees.

74.   Blue Cross and Blue Shield of Florida is the eighteenth largest health insurer in the

country by total medical enrollment, with approximately 2.9 million enrollees. Its Service Area is the state of Florida. But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Florida would be likely to offer its health insurance services and products in Alabama in competition with BCBS-AL. Such competition would result in lower health care costs and premiums paid by BCBS-AL enrollees.

75. Blue Cross and Blue Shield of Tennessee is the twenty-second largest health insurer in the country by total medical enrollment, with approximately 2.5 million enrollees. Its Service Area is the state of Tennessee. But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Tennessee would be likely to offer its health insurance services and products in Alabama in competition with BCBS-AL. Such competition would result in lower health care costs and premiums paid by BCBS-AL enrollees.

76. Blue Cross and Blue Shield of Louisiana is the thirty-fifth largest health insurer in the country by total medical enrollment, with approximately 1.1 million enrollees. Its Service Area is the state of Louisiana. But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Louisiana would be likely to offer its health insurance services and products in Alabama in competition with BCBS-AL. Such competition would result in lower health care costs and premiums paid by BCBS-AL enrollees.

77. In addition to the foregoing examples, there are dozens of other Blue plans that would and could compete in Alabama but for the illegal territorial restrictions. As alleged above, fifteen of the twenty-five largest health insurance companies in the country are Blue plans: if all of these plans, together with all other BCBSA members, were able to compete in Alabama, the result would be lower costs and thus lower premiums paid by BCBS-AL enrollees.

23

## BCBS-AL MARKET POWER IN RELEVANT ALABAMA MARKETS

78.  BCBS-AL has market power in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of Alabama.

## RELEVANT PRODUCT MARKET

79.   The relevant product market is the sale of full-service commercial health insurance products to individuals and small groups.

80.   Full-service health insurance provides coverage for a wide range of medical and surgical services provided by hospitals, physicians, and other health care providers.  In contrast, *single-service* health insurance provides narrow coverage restricted to a specific type of health care, e.g., dental care.   Single-service health insurance is sold as a compliment to full-service health insurance when the latter excludes from coverage a specific type of health care, e.g., dental care.   Thus, full-service health insurance and single-service health insurance are not substitutes.

81.  Consumers of health insurance products include both *individuals* and *groups*, such as employers who select a plan to offer to their employees and typically pay a portion of their employees' premiums. Group consumers are broken down into two categories, *small group* and *large group*, based on the number of persons in the group.  The Kaiser Family Foundation, which publishes an influential yearly survey of employer health benefits offered across the United States, defines small firms as those with 3-199 employees and large firms as those with 200 or more employees.

82.   For the purposes of market division, it is appropriate to consider the individual and small group health insurance product market as distinct from the large group health insurance

24

product market.  In the former, consumers are largely unable to self-insure and competition is therefore restricted to plans that offer fully-insured health insurance products; in the latter, consumers are able to self- insure and the bulk of competition occurs between firms offering ASO products. Across the United States, 84 percent of small group consumers do not self-insure, while 83 percent of large group consumers do self-insure.  Even apart from the prevalence of ASO products in each market, individual, small group, and large group product markets are distinct because health insurers can set different prices for these different consumers.  Thus, pricing in the large group market would not impact competition in the small group market, and vice versa.

## RELEVANT GEOGRAPHIC MARKETS

83.    BCBS-AL does business throughout the state of Alabama, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of Alabama, and has agreed with the other member plans of BCBSA that only BCBS-AL will do business in Alabama under the Blue brand.  Therefore, the state of Alabama can be analyzed as a relevant geographic market within which to assess the effects of BCBS-AL's anticompetitive conduct. In 2008, BCBS-AL held at least 93 percent of the market share of the relevant Alabama product market.

## BCBS-AL'S  MARKET (PRICING) POWER IN THE RELEVANT MARKET

84.    Over the past decade, BCBS-AL generally raised individual and small group premiums by amounts greater than the national average.  In 2010, for example, BCBS-AL raised individual premiums more than 17 percent in some instances.  During the relevant class period, BCBS-AL has not suffered a loss of subscribers such that the price increases for individual and

small group full service commercial health insurance proved unsustainable and unprofitable. During the relevant class period, BCBS-AL has not reduced prices on the relevant product as a result of subscriber defection.

85.    Under the merger guidelines used by the Department of Justice and the Federal Trade Commission, the market for commercial health insurance in the State of Alabama is "highly concentrated" with a HHI index in excess of 8000.

86.    These rising premiums have enabled BCBS-AL to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization.  From 2001 to 2009, BCBS-AL grew its surplus by 68 percent, from $433.7 million to $649 million. In 2011, BCBS-AL's reported net income of $256.92 million represented a 58 percent increase from 2010.

## COUNT ONE

(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

87.    Plaintiff incorporates by reference and realleges the factual allegations in Paragraphs 1 through 86.

88.    The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-AL and BCBSA represent horizontal agreements entered into between BCBS-AL and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

89.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-AL represents a contract, combination and conspiracy within the meaning of Section 1 of the Sherman Act.

26

90. Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-AL have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.   By so doing, the BCBSA members (including BCBS-AL) have conspired to restrain trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

91.   The market allocation agreements entered into between BCBS-AL and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

92.  BCBS-AL has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

93.   Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a.  Reducing the number of health insurance companies competing with BCBS-AL throughout Alabama;

      b.  Unreasonably limiting the entry of competitor health insurance companies into Alabama;

      c.  Allowing BCBS-AL to maintain and enlarge its market power throughout Alabama;

      d.  Allowing BCBS-AL to raise the premiums charged to consumers by artificially inflated, unreasonable, and supra-competitive amounts;

      e.  Depriving consumers of health insurance of the benefits of free and open competition.

94.   The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

95.     The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

96.     As a direct and proximate result of BCBS-AL's continuing violations of Section 1 of the Sherman Act, Plaintiff and other members of the Alabama Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid higher health insurance premiums to BCBS-AL than they would have paid with increased competition and but for the Sherman Act violations.

97.     Plaintiff and the Alabama Class seek money damages from BCBS- AL and BCBSA for their violations of Section 1 of the Sherman Act.

## COUNT TWO

(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

98.     Plaintiff incorporates by reference and realleges the factual allegations in Paragraphs 1 through 97.

99.     BCBS-AL has monopoly power in the individual and small group full-service commercial health insurance market in Alabama.    This monopoly power is evidenced by, among other things, BCBS-AL's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

100.    BCBS-AL has abused and continues to abuse its monopoly power in order to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

101. BCBS-AL's conduct constitutes unlawful monopolization and unlawful anti-

28

competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

102.   As a direct and proximate result of BCBS-AL's continuing violations of Section 2 of the Sherman Act, Plaintiff and other members of the Alabama Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid higher health insurance premiums to BCBS-AL than they would have paid but for the Sherman Act violations.

103.   Plaintiff and the Alabama Class seek money damages from BCBS- AL for its violations of Section 2 of the Sherman Act.

## **COUNT THREE**

(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

104.   Plaintiff incorporates by reference and realleges the factual allegations in Paragraphs 1 through 103.

105.   BCBS-AL has acted with the specific intent to monopolize the relevant markets.

106.  There was and is a dangerous possibility that BCBS-AL will succeed in its attempt to monopolize the relevant markets because BCBS-AL controls a large percentage of those markets already, and further success by BCBS-AL in excluding competitors from those markets will confer a monopoly on BCBS-AL in violation of Section 2 of the Sherman Act.

107.   BCBS-AL's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the Alabama Class. Premiums charged by BCBS-AL have been higher than they would have been in a competitive market.

108.    Plaintiff and the Alabama Class have been damaged as the result of BCBS-AL's attempted monopolization of the relevant markets.

## RELIEF REQUESTED

WHEREFORE, Plaintiff request that this Court:

a.    Determine that this action may be maintained as a class action under Fed. R. Civ. P. 23;

b.    Adjudge and decree that BCBS-AL has violated both Section 1 and Section 2 of the Sherman Act;

c.    Award Plaintiffs and the Alabama Class damages in the form of three times the amount by which premiums charged by BCBS-AL have been artificially inflated above their competitive levels during the Class Period;

d.    Award costs and attorneys' fees to Plaintiffs;

e.    Award any such other and further relief as may be just and proper.

Dated:  March 7, 2013

s/ *Herman Watson, Jr.*
Herman Watson, Jr.
Rebekah McKinney

OF COUNSEL:
WATSON MCKINNEY, LLP
203 Greene St. SE
Huntsville, AL  35801
Telephone:  (256) 536-7423
Facsimile:  (256) 536-2689
mckinney@watsonmckinney.com

30

s/*Richard P. Rouco*
Richard P. Rouco
Glen M. Connor

OF COUNSEL:
QUINN, CONNOR, WEAVER,
  DAVIES & ROUCO, LLP
Suite 380E, 2700 Highway 280
Birmingham, AL  35223
Telephone:  (205) 870-9989
Facsimile:  (205) 803-4143
rrouco@qcwdr.com

**JURY DEMAND**

Plaintiffs demand a trial by jury.

**PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL AS FOLLOWS:**

BLUE CROSS AND BLUE SHIELD OF ALABAMA Attn:
Legal Department
450 Riverchase Parkway East
Birmingham, AL 35244-2858

BLUE CROSS AND BLUE SHIELD ASSOCIATION Attn:
Legal Department
225 North Michigan Avenue
Chicago, IL 60601